DAVID L. LEWIS, appellant, vs. MARGARET JONES and others, respondents.

Neither the court of chancery of this state, nor the Supreme Court, has decided that a will made by an habitual drunkard, while subject to a commission, is, for that reason, absolutely void; but the law is, and should be, that such a person, if of sufficient mental capacity, may make a valid will, notwithstanding the commission. The existence of the commission is only *prima facie* evidence of incapacity, and may be rebutted by proof.

A legatee and devisee named in a will, though not a party to the proceedings before the surrogate for the probate of the will, may appeal from the decree of the surrogate refusing to admit the will to probate, without first obtaining leave from the court, to do so.

APPEAL from a decree of the surrogate of the county of Oneida, refusing to admit to probate the last will and testament of John T. Jones, deceased ; on the ground that Jones was under charge of a committee, as an habitual drunkard, and, therefore, had no power to make a last will and testament without leave of the court.

*A. M. Beardsley,* for the appellant,

*O. S. Williams,* for the respondents.

FOSTER, J.   It was argued by the counsel for the respondent, that the decision of the surrogate should not be reversed, because the circumstances of the case showed, as appeared by the evidence, that the will itself was an improper one, and unfit to be upheld.

With that question, we have nothing to do.   It had no influence upon the surrogate.   He did not reach it in his determination of the case.   He decided it upon the sole ground, that the testator, while under the commission, could not make *any* valid will ; however sound his mental condition ; however free he might have been from restraint, or undue influence ; or however right and just might be the distribution which it made of his estate.   Or, if it did influence his

decision, it furnishes no reason why we should be affected by it in reviewing his decree.

Whether, or not, the will of a person under a committee, as an habitual drunkard, is, under all circumstances void, when not authorized by an order of the court, is a question of too much importance to be affected by the fact that this particular will, is, or is not, one proper to be sustained. If the law is, as the defendants' counsel contends, the equities of the will are entirely immaterial. And if the counsel for the appellant is right in supposing that being under the charge of such committee is only *prima facie* evidence of incapacity to make a will, which may be rebutted by proof, then all such questions will properly come before the surrogate, when the will is again before him for probate.

It is conceded by the counsel for both parties, that in England, the taking of an inquisition, and the appointment of a committee, whether of lunacy, or in the case of an habitual drunkard, is only *prima facie*, or presumptive evidence of incompetency to make a valid will; as well where it was executed after the inquisition found, as during the previous time overreached by the finding. And the counsel for the respondents contend that the same rule, to the same extent, applies *there* to contracts. It doubtless is the same in regard to contracts executed before the taking of the inquisition, and which are overreached by the finding ; but there is much conflict in the decisions as to contracts made after the inquisition found ; though perhaps the better opinion is, that in such cases the finding is only *prima facie* evidence of incompetency. And in the case of the execution of a will by a lunatic or habitual drunkard, after a committee is appointed, the rule that it is only *prima facie* evidence of incompetency, is uniform and unquestioned. (1 *Jarman on Wills*, 2d *Am. ed.* 79 *and note* 1. 1 *Williams on Executors*, 4th *Am. ed.* 37, *note* 1, *and* 38, *note* 1. *Sergeson* v. *Sealey*, 2 *Atk.* 413. *Shelford on Lunacy*, 296. *Grove* v. *Thomas*, 2 *Hag.* 449.)

In *Hall* v. *Warren*, which was the case of a contract made

by an alleged lunatic before inquisition found, the party entitled to the benefit of the contract did not traverse the inquisition; but claimed that the agreement was made during a lucid interval; and the master of the rolls, said : "It was not therefore improper for the plaintiff, under the circumstances, to waive the opportunity of traversing, and to come here for an issue ; upon the supposition that the contract was entered into, either by a person who was not a lunatic, or in a lucid interval. In the latter case it would be equally binding ; for the law upon this subject is, that all acts done, during a lucid interval, are to be considered done by a person perfectly capable of contracting, managing and disposing of his affairs at that period. This has more frequently occurred upon wills. A multitude of questions has been raised upon the execution of a will during a lucid interval ; and that being proved, the will has been held valid and effectual to all intents and purposes for the conveyance of real and personal estate, as if the testator had never been deranged." (9 *Ves.* 610.)

*Shelford on Lunacy*, (296,) says : "It will be inconsistent with the nature and object of a commission of lunacy to allow the party subject to it, to alien his estate by deed, even during a lucid interval ; but as a will does not take effect until his death, it may be doubted whether the same objection would apply to a disposition by will, made during a lucid interval by a person subject to such a commission." (17 *Edw.* 2, c. 10, *and Shelford on Lunacy, pages* 11 *and* 264.) It will be seen, therefore, that Shelford did not consider the rule in regard to deeds and agreements, as above stated, to. be settled ; but that it was so in the case of wills.

In this state "inquisitions" (in cases of lunacy, or habitual drunkenness) "being made under competent public authority to ascertain matters of public interest and concern ; are said to be analogous to proceedings *in rem ;* to which no one can strictly be a stranger. They are clearly admissible in evidence. Inquisitions of this nature are public and·

notorious, and presumed to be known to those who subsequently deal with the subjects of them.   And as to all business which the committee is authorized to transact for the drunkard, strangers must deal with the committee, and not with the drunkard, until the inquisition is set aside.   (*Per Ruggles, Ch. J. in Wadsworth* v. *Sharpsteen,* 4 *Seld.* 392.) This language of the chief judge, carefully draws the distinction between those acts on the part of the drunkard, which the committee may perform in his behalf, either with, or without, the special authority of the court, and those which he cannot.   And while he holds that the one class of acts are void, he clearly implies that as to the other, the rule is different.   In that case the action was brought to recover against the defendant as indorser of a promissory note, indorsed before he was found to be an inebriate ; upon which he waived notice of protest, after the finding of the inquisition ; in consequence of which, the plaintiff, who was the *bona fide* holder, did not give notice ; and the court held the waiver to be void.

In *L'Amoureux* v. *Crosby*, (2 *Paige,* 422,) a bill was filed to set aside two judgments ; one of which was entered upon a bond and warrant of attorney, executed by the defendant while he was under a committee, as an habitual drunkard, and executed only two days after the finding of the inquisition ; and the court set that judgment aside, and laid down the rule, that all contracts, and all gifts of their property, made by idiots, lunatics and habitual drunkards, after the actual finding of the inquisition, were void ; and that it was a contempt of the court, for a person to interfere with the property of a lunatic, or habitual drunkard, after he is informed of the institution of proceedings to declare his incompetency. In delivering his opinion, the chancellor, at page 427, says : "As to acts done by the lunatic or drunkard, before the issuing of the commission, and which are overreached by the retrospective finding of the jury, the inquisition is only presumptive, but not conclusive evidence of incapacity.   But

all gifts of the goods and chattels of the idiot, lunatic, or drunkard ; and all bonds, or other contracts made by him after the actual finding of the inquisition declaring his incompetency, and until he is permitted to assume the control of his property, by the permission of the court, are utterly void. This doctrine is fully stated in *Beverly's case*, (4 *Coke R.* 126 *b ;* 127 *a.*) The same opinion is intimated by the Supreme Court of Massachusetts in *White* v. *Palmer*, (4 *Mass. Rep.* 147.) Although the court afterwards decided that a lunatic, restored to his reason, might make a valid will, even if there had been no formal revocation of the letter of guardianship, they conceded that the finding of the judge of probate, was evidence of incompetency at the time his decree was made. Here the defendant admits that he took this last bond and warrant two days after the jury had found Stafford incompetent to contract, and with a full knowledge of all the circumstances. It was, therefore, an unwarrantable interference with the proceedings and powers of this court, to attempt to get a judgment by confession against him, and " to seize upon his property by an execution at law, without the permission of the chancellor."

The case of *Wadsworth* v. *Sherman*, (14 *Barb*. 169,) is the same case, before the Supreme Court, as *Wadsworth* v. *Sharpsteen*, on appeal ; and the court there decided, as did the Court of Appeals, that all gifts of the goods and chattels of an idot, lunatic, or drunkard ; and all bonds or other contracts made by him after the actual finding of the inquisition declaring his incompetency, and until he is permitted to assume the control of his property by the permission of the court, are utterly void.

To this extent, the question, in this state, may well be considered settled ; but none of these cases, as I understand them, are authority for the doctrine, that a person under a committee as a lunatic, or habitual drunkard, cannot make a valid will without leave of the court. The commission, certainly, does not authorize the committee to make a will

for his ward ; or to dictate to him the terms of it ; nor does it vest such power in the court. That remains in the lunatic, or inebriate, or else it is suspended or extinguished. The execution of a will by the lunatic or drunkard, is not, in terms, forbidden by the commission; and its only proper office, I think, is to take from the lunatic or habitual drunkard, the care and management of his property, to prevent his making gifts of it ; or contracts which bind, or affect it ; and to give the committee the power to take care of it for the ward ; and, to a limited extent, to make contracts in regard to it. It is to prevent the lunatic or inebriate from squandering it. To let all other persons know, that they are not to deal with him in regard to it; and that another person is substituted in his stead, to whom they must apply if they wish to bargain for it. I am well satisfied that the rule, to this extent, is better adapted to prevent imposition upon the lunatic or drunkard, by designing men, who would take advantage of his peculiar mental condition, at times, to strip him and his family of his property, by inducing him to make improvident bargains with them ; or who would make improper appeals to his generosity for gifts, than is the rule, as upon the whole, it seems now to be established in England. It holds out distinctly to all persons that they can obtain no advantage by contracts which they may make with him, whether he has a lucid interval, or is intoxicated, or not. It warns them that no acts of theirs to divest him of his property can be effectual. That the court will set aside all such transactions without inquiring into his actual condition. And while the rule, to this extent, affords an ample shield and protection to the lunatic, or habitual drunkard ; it operates only as such, and deprives him of no natural right, the exercise of which is consistent with the safety of his property.

A will, certainly, is not a contract, or conveyance, in the sense used by the court in any of the cases above referred to. It is the act of one party only. It is entirely inchoate. No

Lewis *v.* Jones.

one is bound by it during the life of the testator; and it is revocable at his pleasure. There is no contracting party to it. No delivery, and no acceptance of it; as there must be in the case of a contract or conveyance. It is not a gift *inter vivos ;* nor is it a gift *causa mortis.* In both classes of gifts, there must be an actual delivery to, or for, the donee, in the lifetime of the donor, and at the time it is made; and the possession of the donor must be actually divested. In the one case, the absolute title passes immediately to the donee, and is irrevocable; and in the other, that of a gift *causa mortis,* the title passes, subject to the payment of the debts of the donor, if it be found necessary to resort to it for that purpose; and subject to revocation by his restoration to health. And in all such cases, the act of the drunkard, or lunatic, is in direct conflict with the rights acquired by the committee, and divests him of the possession; and is in defiance of the order of the court, by which the committee was appointed.

It was claimed on the argument, that the case of a will, is like that of a deed executed by the lunatic, or habitual drunkard, which by its terms, is to vest the fee in the grantee at the death of the grantor; and that if a will so made is not absolutely void, it necessarily follows that such a deed would be held good. There is a similarity between the two cases, in that the title, if the will be not revoked, or changed, vests, in both cases, at the death; but in all other respects they are dissimilar. The deed is subject to all the same consequences, and is in character like all other contracts. It is the act of two parties. It must be delivered. Both parties to it act in defiance of the order of the court, in the execution and acceptance of it. And although the title in fee does not vest in possession until the death of the grantor, their rights under it are fixed by the delivery; and it is not revocable. The only uncertainty being as to the time when the grantee's title will vest in possession; and its operation is in hostility to the rights of the committee; for though he

does not come into possession until the death of the grantor, he then takes it in hostility to the claims of the creditors, if any, of the grantor ; for whose protection, as well as for the protection of the lunatic, or habitual drunkard, during his life, the committee is appointed. · The will, in addition to the other distinctions before mentioned, is not in hostility to creditors of the testator, and does not affect the right of the widow to her dower in the real state of the testator. And the doctrine which includes wills and testaments, in the same category with contracts, gifts, and conveyances, establishes the principle that the court can intervene in the case of a person under committee, either as a lunatic, or habitual drunkard ; not only to protect the property during his life, but can also control the descent of such property as he leaves at his death, in despite of him ; however competent he in fact may be, to dispose of it himself.

· I have shown, that assuming such a will to be valid, all legal claims upon the testator are upheld and saved ; and all dower rights are protected. And why should not the testator, if really competent, beyond all question, so far as mental capacity is concerned, be allowed to dispose of the residue in his own way? And why should the court interfere to regulate the disposition of it, after the testator is in his grave? The law sanctions certain claims upon it, as that of his creditors, and the dower right to the real estate ; but beyond that, a testator can do as he pleases. He can prevent his widow from taking any part of his personal estate ; and he can prevent his children from having any share in its distribution, or in any part of his real estate. And as to all this, they have no vested rights. They are entitled to just what he pleases to give them, and no more. It is true, that in cases of intestacy, the law distributes the property in a certain manner ; but would it not be intolerable to divest the owner, under all circumstances, of the right to dispose of his property as he pleases, when he has all the mental capacity to do so judiciously. The laws which regulate

Lewis v. Jones.

descents and distributions, very frequently do great injustice to the principles which they assume. Their assumption is, that when the ancestor dies intestate, the widow shall have one third of the personal estate, absolutely ; and the use of one third of the real estate during her life ; and that the children, *per capita*, and the children of his deceased children, *per stirpes*, shall receive equal portions of the residue, subject to such advancements as shall have been made to them. But deduction from any of the shares because of advancements, cannot be made, unless it appears that the amounts had been received *as* advancements ; and it frequently happens that while large portions of an estate have been expended in the support and education of the elder children in the lifetime of the parent, who at his death leaves other children, too young to have required much expenditure in their support and education ; and too young to support themselves ; that they are compelled to share what remains, equally with those who have received such greater shares ; and who are also abundantly able to take care of themselves. And there will likely be many more cases of unjust distribution under the laws regulating descents and distributions, than will ever occur from the unequal provisions of last wills and testaments.

It is claimed, also, that the precise question now pending has been decided by the court of chancery, and by the Supreme Court of this state, against the validity of such a will ; and therefore, whatever the law in England may be, and whatever it may be in other states of this Union, that in this state, the will of a person under a commission as an habitual drunkard, is absolutely void. And the cases *In the matter of Burr*, (2 *Barb. Ch.* 208,) and *In the matter of Patterson*, (4 *How. Pr.* 34,) are cited in support of this conclusion.

If these courts have really decided the precise point involved here, upon solemn argument upon the question, although we should not be entirely controlled by them, we

should not depart from the rule there laid down, or attempt to overturn it, without grave and good reasons for doing so. But has the court, in either of those cases, adjudicated the precise questions now before us ? *In the matter of Burr,* which is the first, in point of time, and the first case of the kind in this state which has been reported, an *exparte* application was made by Burr to the chancellor in 1847, for leave to make a last will and testament, and that a commission of lunacy and inquisition thereon might be so far suspended, as to allow him to make such will. It appeared that the inquisition had found, more than two years previously, that Burr was a lunatic. It had found him to be such ; and not an habitual drunkard. That he had a very large personal estate. That he was of unsound mind ; and it is stated by the chancellor that such unsoundness of mind was produced in a great measure by causes other than intoxication. The chancellor in deciding the application said, " The only question in this case is as to the power of this court to suspend the operation of the commission, and of the inquisition, so far as to allow him to make a testamentary disposition of his property, without discharging the proceedings against him entirely, and restoring him to the full control of his estate for every purpose. But upon a careful examination of the question, I think the court has the power to discharge the proceedings against him partially ; retaining the control of his property, so far only as may be deemed necessary to protect the same for his benefit. This has frequently been done by the court in the case of habitual drunkards, who had been found incapable of governing themselves and managing their property, and who were actually endeavoring to abandon their former degrading habits ; but who had not yet so far overcome the cravings of their diseased appetites as to render it safe to put their property wholly under their control. The case under consideration is similar in principle ; although the petitioner's original incompetency did not arise, entirely, from his use

Lewis *v.* Jones.

of intoxicating liquors, but was produced in a great measure by other causes, which are now removed. I shall therefore order, &c." And after directing what was to be done, the chancellor adds: "The sole object of this order being to remove the technical objection that a person who has been found by inquisition, to be incapable of governing himself, and managing his affairs, is legally incompetent to make a valid will while his person and property are under the control of the committee appointed by the court."

I have made this somewhat extended extract from that case, in order to present all the questions before the chancellor; and to show the whole scope of examination made by him. And in the first place, it is clear that the proceeding was *ex parte*, and unopposed, in any way. That no counsel were heard before him, but the application was made by the lunatic himself. The chancellor says: "The only question in this case is, as to the power of this court to suspend the operation of the commission and of the inquisition so far as to allow him to make a testamentary disposition of his property, without discharging the proceedings entirely, &c." And he says it has frequently been done by the court in the case of habitual drunkards.

To what cases the chancellor alluded; or what was the extent to which those cases went, except to decide the question of suspending the inquisition, we are not informed. If they were cases decided by the court of chancery of this state, he would probably have referred to them, whether reported or not, and we could have seen whether such suspension was for the purpose of restoring the party to legal competency to make a will; or whether it was only for the purpose of removing the *prima facie* evidence of incompetency. If he referred to the English cases, or those in Massachusetts, or New Jersey, such suspension was only to get rid of the presumptive incompetency; for as I have before stated, there is no question, there, that the presumption is only *prima*

*facie,* and I am not aware of any state, in which the rule is otherwise.

When the law holds a commission and inquisition to be only *prima facie* evidence of incompetency to make a will, it is entirely proper to apply for a suspension, where the declared lunatic or habitual drunkard desires to make one; because such suspension will remove the presumptive incompentency; though, of course, there is not the same great necessity for doing so, as where, without it, the will would be void. It therefore follows, that the mere application for, and granting the permission, does not prove that without it a legal will cannot be made; and before we can ascertain, for certainty, what is decided, in granting such a suspension, we must know distinctly for which of the causes it was granted, and upon what authority the decision was made. It is proper also to say, that the case of Burr is the first one in this state, so far as appears by the reports, where the question of the competency of one under a committee, to make a will, has been, even incidentally raised; and in that case there is no discussion of the question, and no authorities referred to; and so far as we know, up to that time, all the authorities in the courts from which we derive our system of jurisprudence, are that the incompetency is only *prima facia.* It is true, that the chancellor, in the latter part of the last paragraph of his opinion says: " The sole object of the order is to remove the technical objection that such a person is legally incompetent to make a will;" but all that is said upon that subject is included in some five or six lines; and appears to be an incidental remark; and without any apparent intention to define, clearly, the extent of the legal incompetency. It may, therefore, as well be for the reason of a presumptive legal incompetency, as of one that is absolute.

It is claimed that the case of *Burr,* is the leading case upon the precise question before us. If it was meant to decide that the incompetency to make a will, created by the inquisition, is obsolete, then it is the *first* case of the kind to

Lewis *v.* Jones.

be found in the books ; but it is not, therefore, any the more a leading case, or entitled to be followed. With no previous adjudged case to support it, all of them being the other way ; without agreement or discussion upon the point, and the question not necessarily before him ; it was a *departure* from all the decisions in this country and in England, and without a single fact or circumstance to distinguish or exempt it from the operation of the strong and uniform current of previous decisions to which it is opposed.

In the *matter of Patterson,* it appeared that he had, in December, 1847, been found an habitual drunkard, and on the 6th of January, 1848, a committee had been appointed. In April, 1848, Watson, justice, *at chambers,* upon an *ex parte* application of Patterson—no notice having been given to the committee or next of kin—and upon a personal examination of him, granted an order to suspend the commission, so far as to enable him to make a will. A will was executed by him. He afterwards made an application to have his property restored to him, and which was pending ; and on the 8th of February, 1849, he died. The probate of his will was opposed by four of the heirs at law, who also made a motion before Watson, justice, at special term, to set aside his chamber order allowing the will to be made, on the ground that the order was made without notice of the application being given to the committee, or next of kin. The court, at special term, denied the motion, and an appeal was taken to the general term ; and Parker, justice, who delivered the opinion, not only held that the order allowing the will to be made, could be granted *ex parte,* which was all that was necessary for the determination of the appeal ; but he also *said* that he did " not think that Patterson could in this case have made a valid last will and testament while the commission remained unrevoked, without the order of the court permitting him to do so. The existence of the commission presented a technical objection, which it was necessary to

remove." After citing the case of *Damon* v. *Stone*, (12 *Mass. Rep.* 488,) where the court held that a lunatic, under commission, might make a will ; and that the inquisition was only *prima facie* evidence of incompetency. He says he thinks a different rule has been established in this state. And to support that opinion he cites *L'Amoureux* v. *Crosby*, (*supra;*) *Beverly's* case, (4 *Coke*, 126, *b.* ;) and the *Matter of Burr*, (*supra.*) Now, as we have already seen, and as Justice Parker quotes it, in his opinion, all that is held in *L'Amoureux* v. *Crosby* is, that all gifts of the goods and chattels of the idiot, lunatic or drunkard ; and all bonds and other contracts made by him after the actual finding of the inquisition declaring his incompetency, and until he is permitted to assume the control of his property by the permission of the court, are utterly void." He then says, this same doctrine was applied in the *matter of Burr* ; and, therefore, he says it is, that he comes to the conclusion above stated.

I have already stated the distinctions between gifts, bonds or contracts, and wills ; and that the case of *L'Amoureux*, v. *Crosby*, does not support the proposition that such a *will* is void. The case of *Beverly*, in 4 *Coke*, has no application to the question whether an inquisition of lunacy or of habitual drunkenness, affects, *prima facie*, or absolutely, the competency of the ward to make a will. And the examination already given to the case of *Burr*, shows, I think, that it is not an authority upon the point in question before us. Besides, except for the dictum of the learned judge, declaring that the inquisition, while pending, was a technical disability to make a will—that question not being involved in the case—there is nothing in the decision which militates against the right of an habitual drunkard, under a committee to make a will, subject to the *prima facie* presumption that he is incompetent. The appellants in that case, on the argument of the appeal, presented but a single ground for the reversal of the order ; which was, that the order of suspension was obtained *ex parte*. The true subject of inquiry therefore

was, whether the making of a will would affect any rights conferred on the committee ; and whether the next of kin to the testator had any such right to his estate, while he was living, as entitled them to notice. Most clearly the committee had no rights, as the will did not take effect until the death of the testator. And, as Justice Porter well said in his opinion, the maxim is, that " no one is the heir of a living person." So that the next of kin had no right to be heard on the application.

If the court had decided that notice was necessary, then the order appealed from must have been reversed, and the motion to set aside the order of suspension should have been granted, whether the inquisition absolutely, or only *prima facie* took away the competency of the testator to make a will. And if it decided, as it did, that notice was not necessary, the order appealed from must have been affirmed, whatever might have been the effect of the inquisition while in force ; for the reason before stated, that there is the same *propriety* for an order in the one case, as in the other. And the court had as good right to grant it to remove a presumptive disability as it had if the disability, without it, were absolute.

If the chancellor, in the *Matter of Burr*, had considered the question, whether the disability created by the inquisition was absolute, or only presumptive, as of much importance in the determination of it ; and especially when no previous reported case can be found deciding that it is absolute ; it cannot well be, that he would have laid down a rule so contrary to that uniformly held in England ; and so opposed to the settled law in some of our sister states, without showing some authority from some quarter in support of it ; or at least without some discussion upon the fitness and propriety of establishing such a different rule.

And the same would have been the case with the learned justice who delivered the opinion in the matter of *Patterson*, In that case, there was a vital question upon the point before

the court, directly involved in the decision ; though it does not appear, from the reported case, to have received any attention from the counsel or the court. And that was, whether an order suspending the effect of the inquisition could be granted by a justice of the Supreme Court, *at chambers.* For if it could not, then the order appealed from should have been reversed, and the order of suspension set aside, or declared void, whether notice of the application for it was given or not. It was certainly an important question in any event ; and if the disability without an order of suspension, is absolute, then it was of the utmost importance ; for in that case, if such an order could not be legally granted at chambers, the will of Patterson, though made pursuant to it, was no better than waste paper ; and no order, of any court, made after the death of the testator, could give it any vitality. I allude to this omission of the counsel and court, merely to show that a very elaborate examination could not have been given to the case.

The chancellor, in the *Matter of Burr,* as well as Parker, justice, in the case of *Patterson,* say, that the order suspending the commission may be made by the *court ;* and if so, the chancellor, of course, could do it ; but can a justice of the Supreme Court, at chambers, exercise the power of the court, except in cases where he is specially authorized to do so by statute. The inquisition, when found, especially when followed by the appointment of a committee, it is claimed takes away the control and disposition of the property of the ward entirely, and invests it in the committee, and the court. It is in the nature of a judgment, not only, but one by which it is claimed that all persons are bound. How, then, can a single judge, at chambers, interpose, and to a certain extent, annul or modify the judgment. The statute has not vested the power to control the estates of lunatics and drunkards in a justice of the Supreme Court, but in the court ; and if I am not entirely mistaken, a judge at chambers, would have the same right to modify any other judgment of the

Lewis *v.* Jones.

court ; or to order that only a certain portion of a judgment should be collected ; or that restitution be made of a part of the money which had been collected thereon, as he has to direct that the inquisition, to a certain extent, and for a certain purpose, shall be disregarded. But as this is not directly in the line of discussion of the question before us, I will not further pursue it.

In the *Matter of Hoag,* (7 *Paige,* 312,) which was an application of a person under committee as an habitual drunkard to have his property restored to him, upon the claim that he had reformed, the chancellor denied the motion, and stated as the rule in such cases, that "total abstinence from all alcoholic liquors, or from intoxication, for at least one year, is necessary to authorize the court to presume that there is a permanent reformation, even under the most favorable circumstances. It must be a voluntary abandonment of the use of intoxicating drink, and not an abandonment which is the result of constraint or of the want of means to procure them." If, therefore, the rule is, 1st. That the will cannot be made without the leave of the court ; and 2d. That the ward, in the case of an habitual drunkard, will not be restored to the control of his property until a full year of total abstinence ; and 3d. That in the meantime it is in the discretion of the court to allow a will to be made or not ; it will necessarily follow that while a committee may be a protection to a drunkard's property, it operates, to quite as great an extent, in inflicting a punishment upon the ward, and upon his family. There may well be, in many such cases, an almost imperious necessity for a person under a committee, as an habitual drunkard, to make a last will and testament. The condition of some of the members of his family may be such, that without it great wrong and injustice would ensue, and some of them may have the strongest claims to the protection and comfort which a proper distribution and protection of the property of the testator for their benefit would afford. And yet under the rule above

stated, it would, in such cases, frequently happen, though the ward was as competent, in fact, to make a will as any other person, that the legal incapacity could not be surmounted.   There might be no court in session to which he could apply, when the exigency happened.   His own physical condition might be such that he could not appear at court to be examined ; or that he could not obtain counsel and be prepared for such a motion, even if the court were in session ; or if the application were made, it might be opposed and defeated by those who were interested to prevent the making of the will : or the court might decline to exercise its discretion in his favor.   In either of which cases, no valid will could be made.

There is nothing, I think, in the suggestion, that the will cannot be made, any more than a contract could be, for the reason that the estate of the lunatic or habitual drunkard by the finding of the inquisition, becomes subject to the control of the court.

The court has the charge and control of the estate, only during the continuance of the commission ; and by the appointment of the committee, it commits the exercise of most of its power to him.   But the right of either, to control and care for the estate and person of the ward, are for his benefit ; and there is nothing in the objects for which the court is vested with its authority over the estate, to sanction the idea, that either the court or committee have any thing to do with its disposition after his death.

In *Oxenden* v. *Lord Compton*, (2 *Ves. Jr.* 72,) the lord chancellor said : " The orders that are made by the persons" (courts) " charged with the custody of lunatics are appealable to the king, in council.   In the series of them, there is one general principle, though I do not say it is not without some possible deviation, that the general object of the attention of the administrator is solely and entirely the interest of the lunatic himself ; and with regard to the management of the estate, for the interest of the owner ; without looking to the

Lewis v. Jones.

interests of those who upon his death may have eventual right of succession ; and nothing could be more dangerous or mischievous than for him to consider how it would affect the successors." And in the *Matter of Salisbury, a lunatic*, (3 *John. Ch.* 347,) Chancellor Kent said : "The governing principle in the management of the estate, is the lunatic's interest, not that of those who may have eventual rights of succession."

With these principles governing the courts, it would be an assumption of authority for them to prohibit such disposition as the ward, by an act which relates to the time of his death, and takes effect only from that time, might make of his estate ; if in fact, when he made it, he was in all things except for the commission, just as competent to dispose of his property judiciously, as the members of the court were to dispose of theirs ; or for them to interpose this technical incompetency (created, so far as it goes, solely to protect his property for himself,) for the purpose of controlling its transmission after his death.

There is no reported case in this state, that I am aware of, which directly decides that a will made by one under a commission is absolutely void ; or that it is only presumptively so. But in some of the cases cited to sustain the position that it is absolutely void, that question is considered by the judges ; and in *Wadsworth* v. *Sherman*, (14 *Barb.* 172,) WELLES, J., who delivered the opinion of the court, after stating what the rule in such cases was in regard to gifts, bonds, and contracts, and that they were void, says : "The rule in Massachusetts is the same, with the exception that the lunatic may, during a lucid interval, after office found, make his last will and testament without the permission of the court. (*White* v. *Palmer*, 4 *Mass. Rep.* 147. *Stone* v. *Damon*, 12 *id.* 488. *Leonard* v. *Leonard*, 14 *Pick.* 280. *Breed* v. *Pratt*, 18 *id.* 115.) And I am not aware that in this state, it has ever been held that a last will and testament, made by a person under a committee, or after inqui-

sition found, although without the permission of the court, would be absolutely void. In the *Matter of Burr*, a lunatic, the order merely discharged the lunatic from the commission and inquisition, so far as to permit him to make his will under the advice, and with the sanction of a vice chancellor. He was left at liberty to revoke and cancel the will without such sanction. But suppose he had made a will without the sanction of the court ; I think it is at least an open question, in this state, whether the persons interested in sustaining it would not be permitted to show that he was of sound mind and memory at the time it was made. I am well satisfied that it has never been judicially held otherwise. If it were necessary, I think it might be shown that such proof would be admissible. The only effect of the commission in such case would be to shift the burden of proof. That, however, is foreign to the question in this case, and the remarks are made only to guard against any inference that I concur in the *remark* found in the case cited from 4 *How. Pr. Rep.* 35, that the rules in this state, and Massachusetts, are different. In the same case when before the Court of Appeals, (*Wadsworth* v. *Sharpsteen*, 4 *Seld.* 393,) the chief judge, in the opinion of the court, after coming to the conclusion that a waiver of protest by a habitual drunkard under commission is void, says: "It has been adjudged, however, that the inquisition is not conclusive evidence of the lunatic's incapacity to make a will. This is an exception to the general rule ; and the reason given for it in the case of *Leonard* v. *Leonard*, (14 *Pick.* 284,) is, that this is an act which the guardian cannot do for him. And in another case, that the making of a will is an act manifestly distinguishable from contracts and other acts done *inter vivos*, and involving no conflict of authority with the guardian ; because the will cannot operate to any purpose till the death of the testator, and by that same event the authority of the guardian," (and he might have added of the court) "is determined." (18 *Pick.* 116.)   " To these may be added, as

especially applicable to the case of a habitual drunkard, that the chief object of the proceeding by inquisition is the preservation of his property, during his lifetime, for the benefit of himself and family, and that the motives which might induce him to make an improper disposition of it during his lifetime, do not exist in relation to a disposition to take effect after his death."

Now, although in that case, as well in the Court of Appeals as in the Supreme Court, the question upon a will was not the direct one in issue; still it was not as to the removal of the disability, whatever it might be, but what effect an inquisition had upon the act of the ward; and although it was as to the effect upon a contract, or act *inter vivos*, it was fit and proper for the court to state specifically, as was done, the extent to which the rule was to apply, and to state also to what cases they did not intend to apply it; and to show why it was so limited. And the propriety of their doing so is the more apparent from the fact that the counsel for the respondent claims that those decisions are in his favor upon the point in question. And how much more confidently could he have relied upon them, if no such distinction had been drawn between acts *inter vivos*, and the making of a will. I think the whole difficulty arises from the want of such careful distinction by the chancellor, in the *Matter of Burr*, and by the learned justice in the *Matter of Patterson*.

In *Wadsworth* v. *Sharpsteen*, in the Court of Appeals, Willard, J. who dissented from the conclusion that the waiver of protest was void, and supported his opinion by several authorities, also held, after commenting upon the cases of *Burr* and *Patterson*, that a will could be made by one under a committee; and that the only effect of the inquisition was to raise the presumption of incompetency, and shift the burden of proof.

In *Willard's Equity Jurisprudence*, published after all the cases in this state above mentioned were decided and

reported, (at pages 199 and 200,) it is said : "In one case where the lunatic was possessed of a large estate, and had so far recovered his reason as to be capable of disposing of his estate by will with sense and justice, the chancellor suspended the proceedings against him partially, so as to enable him to make a will. (*Matter of Burr.*) The effect of such suspension, if its terms are complied with, removed the *prima facie* presumption of a want of testamentary capacity, and left it, as in the case of other persons, a matter of proof. But the case does not show that a person against whom a commission of lunacy remains in full force may not, if his competency be in truth restored, make a valid testamentary disposition of his property."

In Massachusets, the rule in regard to gifts and contracts, is, that while a person is under a committee, he is incompetent to make them, and that they are void. (*Leonard* v. *Leonard*, 14 *Pick.* 280. *Wait* v. *Maxwell*, 5 *id.* 217. *White* v. *Palmer*, 4 *Mass. Rep.* 147.) And while it is so settled, in the case of contracts and gifts, it is also settled that in the case of wills the rule is otherwise. That the inquisition is only *prima facie* evidence of incompetency, and that the will is valid if the testator is proved to be of sound mind, notwithstanding the commission ; and the rule applies not only to habitual drunkards but to lunatics also. (*Stone* v. *Damon*, 12 *Mass. Rep.* 488. *Breed* v. *Pratt*, 18 *Pick.* 115.)

In New Jersey, also, it is decided that a commission of lunacy is not conclusive against the competency of the testator to make a will ; but only *prima facie,* and may be rebutted by proof. (*Whitmarsh* v. *Stryker*, 1 *Green's Ch.* 8.) In that case, the will was made in 1830. A codicil was made in August, 1833. In May, 1834, a commission of lunacy was issued, and the testator was found to be a lunatic, and that he had been so for thirty months ; which covered the time of the making of the codicil. In August, 1835, he added another codicil to the will. The court held that the inquisition was valid ; but that both codicils, the one executed

*after,* as well as the one executed before the commission of lunacy, were valid.

This also is the rule laid down in the elementary works where this subject is treated of, as in *Shelford on Lunacy,* 296, before referred to. In *Jarman on Wills,* (2d Am. ed. 78,) it is stated that " a person under guardianship as a lunatic, or *non compos mentis,* may make a will if he is in fact of sound mind at the time of its execution. The fact that he is under such guardianship is *prima facie* evidence of incapacity, but open to explanation by other proof." So, also in 1 *Williams on Ex.* (4th Am. ed. 37, *note* 1,) " A lunatic restored to his reason, may make a will, though the guardianship under which he was placed as *non compos* remains.

The rule, as stated in *Bouvier's edition of Bacon's Abr. title " Of Wills and Testaments B." at p.* 483, is the same. So in 1 *Greenleaf's Evidence,* (5th ed. § 673,) in the discussion of testamentary capacity, it is said : " The fact of his being under guardianship at the time, falls under the same rule ; being *prima facie* evidence of incapacity, but open to explanation by other proof."

These elementary works are all recent editions, and furnish evidence that none of their authors has supposed that the rule in regard to testamentary capacity, is at all different in this state, from what, so far as appears from the reported cases, it is every where else.

But, if there were doubt of the power of one under a commission of *lunacy* to make a valid will, it does not necessarily follow that the same doubt applies to a will made by one under a commission as an habitual drunkard. Lunacy, in the strictest sense, implies unsoundness of mind ; and except where the inquisition finds lucid intervals, the presumption of law is, that there are none. And when the testator is found to have been insane previous to the execution of his will, it is incumbent on those who would uphold it, as valid, to prove, that at the time of its execution, the

testator enjoyed a lucid interval ; even though he was not subject to a commission. While the rule in regard to a will of an habitual drunkard, not under a commission, is otherwise. There, the rule is that the burden of proving him drunk at the time of its execution is thrown upon the contestant. Drunkenness always has its sober intervals, lunacy does not. Lunacy is not always easily discovered. It is sometimes latent. It frequently is, accompanied by cunning, which enables the lunatic for a considerable space of time, to make even his friends believe that he enjoys a lucid interval, when in fact he is insane. So too, when persons are so insane upon some subjects as to be incompetent to transact business understandingly, they may upon other subjects be entirely rational. Drunkenness, always exposes itself ; and it is impossible for a person who is too drunk to transact business correctly, to feign sobriety so as to deceive any one of ordinary sagacity. *Shelford,* at pages 304, 305, says : "Besides insanity, properly so called, a species of insanity, the mere effect of drunkenness and excitement from intoxicating liquors, has sometimes been set up for the purpose of defeating an alleged will. It has, however, been very justly observed, (*per Nicholl, J.* 2 *Add.* 209,) that whatever resemblance there may be in the conduct and actions of a man under such excitement, and those of a person properly insane, their apparent similarity are subject to a very different condition. Where actual insanity has shown itself, either perfect recovery, or at least a lucid interval at the time, must be clearly proved, to entitle an alleged testamentary paper to be pronounced for as a valid will. Either of these, however, the last especially, is highly difficult of proof, for this reason—that insanity will often exist, though latent ; so that a person may, in effect, be completely mad, or insane, on some subjects, and in some parts of his conduct apparently rational ; but the effects of drunkenness, only subsist while the cause, the excitement, visibly lasts. There can scarcely be such a thing as latent ebriety ; so that a case of incapacity from

mere drunkenness, and yet the man be capable, to all outward appearance, can hardly arise. Consequently, in cases of this description, all which is required to be shown is, the absence of such excitement at the time of the act done, as would vitiate it."

As one of the several cases which hold that the fact of habitual drunkenness raises no presumption, that at the time of the act done, the inebriate was drunk, I refer to *Wheeler* v. *Alderson,* (3 *Haggard Eccl. Rep.* 574, 602, 616,) which was the case of a will, and no commission; where the testatrix was a habitual drunkard, and in constant habit of intoxication. It was held that it was the duty of those contesting the will, (the subscribing witnesses being merely called to subscribe, and not noticing the condition of the testatrix,) to prove if they could, that she was then intoxicated so as to be legally disqualified from doing the act ; and this in a case where the bequests were, to a large extent, out of the line of descent," and it was said that "intoxication is a temporary insanity. The brain is incapable of discharging its proper functions. There is temporary mania ; but sobriety brings with it a return of reason." The proof in that case showed that her intoxication was habitual, and almost constant ; and witnesses thought her mind at all times unsound, but yet the court said they must show her an inebriate at the time of the *factum.* ·

Now, if clearly proved, habitual, and almost constant, drunkenness, does not, *prima facie,* disqualify the testator, how is it that the inquisition, (which only declares that he *is* a habitual drunkard,) does so absolutely ? True it does disqualify as to acts *inter vivos,* because they are in contravention of the power vested in the court to protect and care for his property for his benefit ; and are in contempt of the order of the court. Is it a punishment of the inebriate ? Is it intended as a penalty or forfeiture of his rights ? Or is it merely a shield for his protection ? Or really, is not the power of the court given and exercised only to prevent waste,

or destruction of his property at the times of inebriation ?
And why should it be a bar, technical or otherwise, to pre-
vent him from doing any thing, at his death, for those who
though not his next of kin, have aided and ministered to
him while he lived ? Or why, as between his heirs at law,
should he not, in a calm and clear interval, have the right
to bestow among them, at his death, such proportions of his
estate as their good conduct, or character, or the previous
unequal distribution among them, or their peculiar condi-
tion or circumstances may show to be judicious and proper ?

Strictly speaking, a man is not of unsound mind, simply
because he is an habitual drunkard. His mind is unsound,
only while the fit of intoxication lasts. (*Blanchard* v.
*Nestle,* 3 *Denio.* 41.) And that is all that is adjudged by
an inquisition finding him to be an habitual drunkard.

Now, if the effect of the inquisition, only declares him to
be unsound while intoxicated, what reason is there, (except
so far as to prevent improper acts *inter vivos,* and to prevent
others from making bargains with him, in contempt of the
court, in relation to things, the control of which is vested
elsewhere,) for giving such a legal effect to the inquisition as
to prevent the performance of an act which the policy of the
statute was not intended to affect ? The act of making a
will is not in contempt of the order of the court ; and it
would be a curious proceeding for a court to attach such a
testator for contempt, for executing a last will and testament ;
and the height of absurdity to attach the devisees, or legatees,
named in the will.

The statute, under which commissions are issued, (2 *R. S.*
52, § 1,) provides that " The chancellor shall have the care
and custody of all idiots, lunatics, persons of unsound mind,
*and persons who shall be incapable of conducting their
affairs in consequence of habitual drunkenness.*' In inter-
preting this statute, we are so to construe it, as to give effect,
if we can, to all the language used in it ; and upon the sup-
position that each part of the section has its appropriate

meaning.   Now, if an habitual drunkard is a person of un-
sound mind; the case of an habitual drunkard was included
in that term.   But the legislature evidently intended to
include more than those who were of unsound mind.   It is
quite apparent that they did not use the words "habitual
drunkard," as synonymous with unsound mind; but intended
to include another class of persons.   This might not have
been quite so certain, if it had used the word "*or*" before
the words "persons," who by reason of habitual drunken-
ness were incapable, &c. but the word "and" shows that they
did not consider a habitual drunkard to be a person of un-
sound mind.

As to the *extent* of the power granted, the act says that
it is the *care* and custody of their persons, and of their real
and personal estates, so that the same shall not be wasted
and destroyed.   And under this branch of the section it has
been held that the court could not order a sale of the real
estate except when it becomes necessary to pay the debts of
the inebriate, or lunatic; or to support himself and family,
(*Matter of Hoag, supra.*)   And the statute expressly pro-
hibits the leasing of the real estate for more than five years,
and mortgaging, aliening, or disposing of it otherwise than
is directed in that act.   (§ 23, *p. 55.*)   It will be seen,
therefore, that the power of the court, even, is limited in its
scope, and limited to purposes to be subserved in the lifetime
of the lunatic, or inebriate.

The act regulating the making of wills and testaments is
part of the same statute.   Is in *pari materia;* and the
language of it is to be construed in connection with that
part of it just considered.   The language of it is, (2 *R. S.*
241, § 1,) "All persons except idiots, persons of *unsound
mind,* married women, and infants may devise their real
estate by a last will and testament, duly executed according
to the provisions of this title."   If the legislature intended
to give the court of chancery power to declare that an inqui-
sition for habitual drunkenness, disqualified one from making

a testamentary disposition of his property, would it not have included in this section, in terms, habitual drunkard, or habitual drunkards under commission ; or have expressly granted to the courts the power to prohibit such wills, in the act which gives them the care and custody of such persons, and of their estates ; and the more especially, as such a power never had before that time been exercised, (so far as appears,) in this state, or elsewhere.

" The right of testamentary disposition is regarded as a common and natural right, to be restrained no further than public policy and the *necessary evidence of intent* and consent, absolutely require. When the testator is shown to possess such a rational capacity as the great majority of men possess, that is sufficient to establish his will." (*Stewart* v. *Lispenard,* 26 *Wend.* 306.) And, therefore, if the legislature has not clearly taken away such right, or evidently authorized the courts to do so, the right remains.

I do not attach much importance to section 25, (2 *R. S.* 55,) which regulates the descent from persons dying under the disability of a commission ; or to the amendment of it by section 1, of chapter 724, of the Laws of 1865 ; because, although the language of the amendment is general enough to include a will made while the commission continues ; it may quite as likely apply to a will made before the unsoundness of mind, or the disability arising from the commission, if any, commenced. Though I am inclined to think that it applies to both.

But independently of that, I come to the conclusion, that neither the court of chancery of this state, or the Supreme Court, has decided that a will made by a habitual drunkard, while subject to a commission is, for that reason, absolutely void ; but that the law is, and should be, that such a person, if of sufficient mental capacity, may make a valid will notwithstanding the commission ; and that the existence of the commission is only *prima facie* evidence of incapacity, and may be rebutted by proof.

Lewis *v.* Jones.

The remaining question is whether the appellant, who was a legatee and devisee named in the will, but not a party to the proceedings before the surrogate, could bring the appeal, without first obtaining leave to do so from the court.

This question was discussed in the opinion of MULLIN, J. when the appeal was before us on the former argument. He came to the conclusion that the appeal was regular ; and upon that question the court was unanimous. I have re-examined the question, and again come to the same conclusion; but as there is no disagreement in regard to it, I do not discuss it here.

The order of the surrogate should be reversed, and a rehearing ordered; on which, the fact that the commission was in force when the will was executed, is to be considered only *prima facie* evidence of his incompetency to make a valid rule ; and that such presumption may be rebutted by proof, that at the time of its execution, the testator, was, in fact, of sound mind.

MORGAN, J. concurred.

MULLIN, J. dissented.

[ONONDAGA GENERAL TERM, April 7, 1868. *Foster. Mullin* and *Morgan,* Justices.]