---

(47 App. Div. 177.)

## In re COE'S WILL.

(Supreme Court, Appellate Division, Third Department. January 8, 1900.)

WILLS—PROBATE—APPEAL—TESTAMENTARY CAPACITY—UNDUE INFLUENCE—RE-
VERSAL—JURY TRIAL.

    Code Civ. Proc. § 2588, provides that, on reversal of a surrogate's decree made on a petition to admit a will to probate on a question of fact, the appellate court must direct the trial by a jury of the material questions of fact arising on issues to be stated by the order, etc. *Held*, that where, on appeal from a surrogate's decree admitting the will of an insane person to probate, it was doubtful from the evidence whether the will was the free act of the testatrix, as executed during a lucid interval, and whether it had been procured by undue influence, the decree should be reversed, and the cause remanded for a jury trial of such issues.

Appeal from surrogate's court, Chenango county.

Application for the probate of the will of Carrie E. Coe, deceased, to which James W. Coe, Alfred W. Coe, and others filed objections. From a surrogate's decree admitting the will to probate, contestants appeal. Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, KEL-LOGG, and MERWIN, JJ.

H. C. & V. D. Stratton, for appellants.
Charles W. Brown (D. L. Atkyns, of counsel), for respondents.

MERWIN, J. The instrument admitted to probate by the decree appealed from bears date and was executed on April 5, 1894. The testatrix died on the 12th August, 1896, leaving, as her only heirs and next of kin, her brother George B. Coe, and the appellants, James W. Coe and Alfred W. Coe, the infant children of a deceased brother, William M. Coe, who died on September 19, 1893. Her estate consisted of personal property to the amount of about $28,000. By the will several pecuniary legacies were given, amounting in the aggregate to about $12,000, among which were legacies to the appellants, James W. Coe and Alfred W. Coe, of $500 each. The balance of the estate was given to George B. Coe, who was also appointed executor. The probate was contested by the appellants upon the grounds of undue influence and want of testamentary capacity. It was also claimed that the formalities required by statute upon the execution of a will were not complied with, but no particular point is now made on that subject.

The decedent at the time of making the will was about 40 years old, and a resident of Chenango county, but was then at Owego, in a private institution for the insane. She had been confined there since

about April 1, 1893. In June, 1893, upon petition of her brother William M. Coe, dated June 2, 1893, a proceeding in due form was instituted in the Chenango county court to inquire as to her lunacy, and for the appointment of a committee of her person and estate. This resulted in an inquisition on the 16th June, 1893, before commissioners and a jury, and a finding that she was a lunatic, and incapable of the government of herself or the management of her property. These findings were confirmed by the court by order dated June 26, 1893; and S. S. Stafford was appointed committee of her person and estate, and a commission was issued to him on August 7, 1893.

In Carter v. Beckwith, 128 N. Y. 312, 28 N. E. 582, it was held that one who has been judicially determined to be a lunatic, and for whom a committee has been appointed, is incapable of entering into a contract, and any contract he assumes to make is absolutely void. This, however, does not apply to the making of a will. Wadsworth v. Sharpsteen, 8 N. Y. 388, 393; Lewis v. Jones, 50 Barb. 645; Breed v. Pratt, 18 Pick. 115. The inquisition, however, is prima facie evidence of incapacity. Lucid intervals may be shown, and if, during such a period, a will is made intelligently and freely, it may be established. 1 Jarm. Wills (5th Ed., by Bigelow) p. 37. The proof, however, should be clear and satisfactory (Schouler, Wills, § 111; 1 Whart. & S. Med. Jur. § 744), and the burden of proof is upon the proponent. "General lunacy being established, the proof is thrown upon the party alleging a lucid interval; and he must establish, beyond a mere cessation of the violent symptoms, a restoration of mind sufficient to enable the party soundly to judge of the act." Hall v. Warren, 9 Ves. 605, 611. In the Breed Case, supra, it is said by Chief Justice Shaw that where a person is under guardianship, as non compos mentis, it is incumbent on the party who would establish a will to show beyond reasonable doubt that the testator had both such mental capacity and such freedom of will and action as are requisite to render a will legally valid. In 1 Jarm. Wills (5th Ed., by Bigelow) p. 34, it is said:

"That, in proportion as the infirmities of a testator expose him to deception, it becomes imperatively the duty, and should be anxiously the care, of all persons assisting in the testamentary transaction, to be prepared with the clearest proof that no imposition has been practiced. This remark especially applies to wills executed by the inmates of lunatic asylums, or any other persons habitually afflicted with insanity."

See, also, Rollwagen v. Rollwagen, 63 N. Y. 504, 518; Weir v. Fitzgerald, 2 Bradf. Sur. 42; Gombault v. Public Administrator, 4 Bradf. Sur. 226, 239.

In all cases of probate of wills it must appear that the testator is of sound mind and memory at the time it was made (Code, § 2623; 4 Rev. St. [8th Ed.] pp. 2545, 2547), and the standard of mental capacity is uniform (Schouler, Wills, § 111). There must be mental capacity sufficient to enable the testator to understand and appreciate the amount and condition of his property, and to comprehend the nature and consequences of his act in executing the will. In re Flansburgh's Will, 82 Hun, 49, 31 N. Y. Supp. 177; In re Snelling, 136 N. Y. 515, 517, 32 N. E. 1006. Whether this capacity existed in the

present case, and whether the will proposed for probate was the free and voluntary act of the decedent, were the important questions to be determined.

The evidence on the part of the proponent tended to show that upon the day the will was made the testatrix appeared to act rationally. Still, the managing physician of the institution, who was also one of the witnesses to the will, testified:

"She was sane as to the will, but she was an insane woman. * * * My theory is that a person in her state of mind could carry out the past, but could not carry out any new arrangement. I do not think she was competent. I think the will was really a creation of the past,—her relation to the past. That element entered quite largely into my judgment in regard to the execution of the will, with her present condition at the time she made it."

This witness had stated on November 20, 1893, in response to an inquiry made to him on behalf of the proponent as to the capacity of his sister to make a will, "that she is not competent to make any disposition of her property in any way, as her judgment seems very defective." It is not made very clear that her mental strength was any greater in April, 1894, than it was in November, 1893. There is evidence tending to show that the making of a will was first suggested by the proponent, and that he was to some extent active in preparations for the making of the will. He, however, in effect, claims that what he did was in accordance with the intelligent request of the decedent. Much reliance is placed on prior statements by the testatrix as to her desire to make a will, and what she desired to do with her property. It is not, however, made very clear that these statements were made at a time of mental soundness, or that such statements as she did make were all in harmony with the provisions of the will. It is not made clear that in her sane periods she had an intention of cutting off the children of her deceased brother with but nominal legacies. There is, besides, some doubt about her having fully understood the provisions of the will. Upon the part of the contestants it is claimed that at no time while the decedent was at Owego did she have mental strength up to the required standard, and that the will was not her free, voluntary act. Evidence is given tending to sustain this position. The decedent had been insane in 1886, but had recovered partially, at least. Upon the death of her mother, on March 1, 1893, there was a recurrence of mental derangement; and about the 1st April she was sent to a sanitarium at Clifton Springs for treatment, and shortly afterwards was taken to the institution at Owego. The disease then upon her seems to have progressed steadily, and finally resulted in her death.

Without further discussion of the evidence, it is sufficient to say that we have carefully examined and considered the large volume before us, and the elaborate and learned briefs of counsel. We are not entirely satisfied with the conclusion reached by the surrogate's court, that the will was the free act of a competent testatrix. The evidence is not clear and satisfactory to that result. There is upon that subject sufficient doubt to make the case a proper one for a retrial before a jury according to the rule in such cases. Code, §

2588; Burger v. Burger, 111 N. Y. 523, 526, 19 N. E. 99, and 21 N. E. 50; In re Pike's Will, 83 Hun, 327, 331, 31 N. Y. Supp. 689; In re Van Houten's Will, 11 App. Div. 208, 42 N. Y. Supp. 919; In re Dixon, 42 App. Div. 481; 59 N. Y. Supp. 421.

The material questions of fact arising upon the issues between the parties are as follows: (1) Did the decedent at the time of the execution of the will in question have testamentary capacity? (2) Was the will in question the free, voluntary act of the decedent? (3) Was the will in question procured by undue influence practiced upon the decedent?

Decree reversed upon the facts, and a new trial by a jury, at a trial term of the supreme court in Chenango county, directed of the questions of fact stated in the opinion. Costs of the appeal to the appellants, payable from the estate. All concur.